## Kast, Appellant, *v.* Public Service Commission et al.

Argued October 19, 1936. 

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*Maurice A. Granatoor,* with him *Joseph B. Meranze,* for appellant.

*Samuel Graff Miller,* with him *Harry H. Frank, John C. Kelley,* and *Richard J. Beamish,* for appellee.

186

_Frank M. Hunter_, for intervenor.

OPINION BY CUNNINGHAM, J., January 29, 1937:

In January, 1935, Wm. J. Kast, acting as attorney in fact for J. M. Anderson, (hereinafter referred to as the appellant), filed a complaint with the Public Service Commission against the Philadelphia Electric Company, (hereinafter called the company), alleging undue and unreasonable discrimination by the company in refusing to admit appellant into a certain class of its customers hereinafter described. In substance, the complaint charged a violation of Article III, Section 8, of our Public Service Company Law of July 26, 1913, P. L. 1374, 66 PS §262, by which it is declared, inter alia, that it shall be unlawful for any public service company to charge any person or corporation for any service rendered a greater or less compensation than it receives from any other person or corporation for a like service under substantially similar circumstances and conditions, or to subject any person or corporation to any undue or unreasonable prejudice or disadvantage in any respect.

After a full hearing and investigation, the commission dismissed the complaint and we now have this appeal by the complainant, in which the company was permitted to intervene as a party appellee. Appellant is the owner of an eight story office building at No. 328 Chestnut Street, Philadelphia, known as the "Brown Building" and is a consumer of electric current, both for lighting and power uses. The building was unoccupied by tenants until May or June, 1933, but appellant became a customer of the company in November, 1932. Shortly thereafter he had a single phase lighting load of 3.550 kilowatts, which by July 1934 had increased to a connected lighting and appliance load of 17.5 kilowatts. He also had a polyphase motor or power load of 27.375 kilowatts which subsequently in-

creased to some extent. Under the tariffs of the company then in effect, appellant was billed under schedule "B" for light, and "C" for power. No criticism is made relative to appellant's original classification under those schedules.

Effective March 2, 1933, the company made a radical change in its "Electric—P. S. C. Pa. No. 7." It consisted in the elimination of the distinction between light and power rates and the substitution of classifications distinguishing between single phase and polyphase service. The prior "B" and "C" rates were withdrawn and a new and reduced retail rate designated "RLP—Retail Light and Power" substituted. Later, January 1935, a further reduction was made by a schedule designated "GLP—General Light and Power Rate," providing for the furnishing of light or power, or both, at retail. Appellant has received the benefit of these reductions.

The controversy which gave rise to these proceedings had its origin in the fact that the schedule put into effect on March 2, 1933, contained a new *wholesale* polyphase light and power rate designated "WLP—Wholesale Light and Power." Under Section 13 of the company's Rules and Regulations, forming a part of its No. 7 schedule and relating to "Customer's Use of Service," a paragraph (No. 5) was included and entitled "Unbalanced Load." It reads: "The customer shall at all times take, and use, energy in such manner that the load will be balanced between phases to within nominally 10%. In the event of unbalanced polyphase loads, the company reserves the right to require the customer to make the necessary changes at his expense to correct the unsatisfactory condition, or to compute the demand used for billing purposes on the assumption that the load on each phase is equal to that on the greater phase." The reasonableness of this rule is not questioned.

In November, 1934, appellant applied to the company for service at the above mentioned wholesale rate, designated "WLP". As we read the record, and avoiding so far as possible the use of technical terms, the company refused his application for service under that rate upon the ground that although he had rewired his building subsequent to the effective date of the "WLP" rate he did not "balance" his load as required by the above quoted rule. In other words, the company admits in its answer that the building is "wired standard for the electric service which said building is now receiving under Rate GLP," but does not have a standard installation which would enable appellant to comply with its "unbalanced load" requirements. Appellant's charge of discrimination seems to be based chiefly upon averments to the effect that a large number of other customers formerly served under a wholesale rate, designated as "D-Max" and superseded by "WLP", were brought under and given the advantage of the new "WLP" rate, but appellant was denied the privilege thus conferred upon certain other customers.

The company admits that one of the changes made in its tariffs on March 2, 1933,—the abolition of its former "D-Max" wholesale rate—left its customers under that rate—approximately 1,200 in number—in a position requiring special consideration.

The members of that group who did not have balanced load wiring could rewire to conform with the requirements of the rule forming part of the new wholesale schedule, "WLP", or they could go under the retail schedule "RLP", and its reduced successor, "GLP". These customers are referred to in the testimony and record as a "transitional" group and it is into this group that appellant demands admission, although he was never under the old "D-Max" rate.

The findings of the commission upon this aspect of the case read: "When the wholesale rate 'D-Max' was

withdrawn there was a residue of approximately 1,200 customers to be disposed of; 200, to their advantage, were transferred to the new and reduced retail rate 'RLP', the same rate under which complainant [appellant] received his service at that time. There was a question as to whether or not the remaining 1,000 wholesale consumers fully met the requirements of the unbalanced load rule as it stood after the revision. Because these consumers had always been properly classified as wholesale consumers and had always developed their load conditions in conformity with the rules of respondent [company] in force from time to time, respondent resolved the doubts in favor of the consumers and classified this group of approximately 1,000 consumers on the 'WLP' or wholesale rate. This policy was with the avowed intention of clearing the situation either through further modifications of the rate schedules or by rearrangement of load conditions within the consumer's property, if and when such consumer made any change in his load or wiring conditions. In line with this policy, when the retail rate 'RLP' was reduced and changed to rate 'GLP', approximately 100 more of the wholesale consumers on the 'WLP' rate who had come over from the former wholesale rate 'D-Max' were transferred to the retail classification. ......

"The retail rate under which complainant is classified is designed to meet the condition where respondent obtains the desired degree of balance between consumers' loads within its own distribution system. The wholesale rate 'WLP', on the other hand, is designed to apply to those consumers who balance their own loads and thus obtain from respondent a service which can be more economically rendered, and at a rate more attractive to them. ......

"Moreover, rate classifications normally arise out of the different conditions under which consumers take

service and the relative obligation placed on the company to provide for that service. Consequently, respondent has the right to file a rate available to those consumers who take polyphase service and balance their own loads on their own wiring circuits. We do not find this to be an unreasonable classification nor is it discriminatory or unreasonable to deny complainant access to the rate 'WLP' when complainant at the time he rewired his property did not arrange his load requirements to meet the then established terms and conditions so that the polyphase rate could be applied to his service without question." Such classification seems to be expressly authorized by Section 1 (b) of Article III of the statute, and we agree with the conclusion of the commission that it is not unreasonable or discriminatory.

It was argued on behalf of appellant that the requirements now made by the company should apply only to new buildings, or those being rewired for additional loads. In reply to this suggestion the commission said: "Complainant is one of those who has rewired his property for additional load since these classifications became legally effective. The fact that respondent did apply this principle to a small group of wholesale consumers with unchanged load conditions does not make respondent's refusal to accord complainant the same classification, an unjust, unreasonable, or discriminatory act. Complainant was formerly and properly classified as a retail consumer and it is only the changes he made in his wiring and load conditions since the present rules went into effect that make his present service at all comparable with these former wholesale rate 'D-Max' consumers. There is no reason why he should be accorded more favorable treatment than the thousands of other wholesale consumers who have met the requirements. He had every opportunity to put him-

self in a position to receive the polyphase wholesale classification had he desired to do so."

Admittedly, appellant's building did not have balanced load wiring at the time of his complaint. The evidence indicates that he began rewiring his building extensively about May 4, 1933, shortly after the "WLP" rate and rule became effective. There was evidence that his superintendent was advised to arrange the wiring to take polyphase service but declined to do so, although the connected lighting load was increased from three to seventeen kilowatts. Estimates of the additional cost to meet the requirements of the rule ranged from $75 to $357.

Another consideration here involved is that the group to which appellant demands admission is a constantly diminishing class of customers, undergoing a gradual process of changing over either to "WLP" or "GLP". Compelling reasons should be shown for adding any new members to that class and thereby prolonging the adjustment of the old "D-Max" consumers to the new classification.

We see nothing unreasonable about making the new "WLP" rate conditional upon compliance with the "unbalanced load" rule; or in refusing that rate to one who has failed to wire his building in a manner which will enable him to comply with the rule.

Again, appellant argues that he should be treated as being in the same position as former "D-Max" wholesale consumers because, as he asserts, he would have been entitled to that rate if he had applied for it immediately prior to its withdrawal on March 2, 1933. Aside from the fact that, for reasons satisfactory to himself, he did not apply for the "D-Max" rate, we are not convinced from the evidence that his service at that time would have entitled him to that rate. The retail rates "B" and "C" under which appellant was then classified were applicable to lighting and power service

to "offices, commercial and industrial establishments," but the "D-Max" rate was available to users of "large quantities" of light or power, or both, and carried "demand" or "stand-by" charges not included in the "B" and "C" rates. Even where a customer is eligible to either of two optional rates his status is determined by his actual selection: *Spear & Co., v. Public Service Commission,* 105 Pa. Superior Ct. 240, 161 A. 441.

Upon an examination of the testimony and exhibits we are satisfied the findings of the commission are supported by the evidence. The subject matter of the complaint and the respective contentions of the parties brought the proceeding within the administrative functions and jurisdiction of the commission. Being of opinion that its action in dismissing the complaint did not exceed the legitimate administrative discretion with which it has been clothed, we shall not disturb its conclusions.

Order affirmed.